E-FILED
Monday, 21 March, 2022  11:16:20 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LAURA L. DIEKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3223 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Laura L. Dieker seeks judicial review of the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This action is brought pursuant to 42 U.S.C. § 405(g).  Dieker filed a Brief in Support of Motion for Summary Judgment (d/e 16).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 19).  Dieker filed a Reply Brief to Defendant's Motion for Summary Judgment (d/e 20). The parties consented to proceed before this Court.  Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order

---

[1] The Court takes judicial notice that Dr. Kilolo Kijakazi, Ph.D., is now the Acting Commissioner of Social Security. As such, he is automatically substituted in as the Defendant in this case.  Fed. R. Civ. P. 25(d).

entered April 5, 2021 (d/e 12).  For the reasons set forth below, the

Decision of the Commissioner is AFFIRMED.

## BACKGROUND

Dieker was born December 17, 1980.  She secured an associate

degree in Allied Health Science and previously worked as a CAN/patient

care assistant, EEG tech, Sleep tech, secretary, daycare provider, and

foster parent support specialist.  She alleged that she became disabled on

June 22, 2016 (Onset Date).  The last date she was insured for Disability

Benefits was December 31, 2018 (Last Date Insured).  Dieker suffered

from degenerative disc disease of the lumbar, thoracic, and cervical spine,

status post multiple spinal surgeries, affective disorder of depression.

Certified Transcript of Proceedings before the Social Security

Administration (d/e 14) (R.), at 13, 27, 44, 228.

## STATEMENT OF FACTS

### Evidence Submitted Before the Evidentiary Hearing

In 2001, Dieker underwent surgery on her lumbar spine at L4-5.   In

2008, she underwent surgery on her lumbar spine fusion at L4-5 and L5-

S1.  In 2015, she had another back surgery.   R. 746-47.

On May 13, 2016, Dieker saw her primary care physician Dr. Lance

Real, D.O., for a follow up on chronic pain, degeneration of cervical

intervertebral disc. She stopped taking Cymbalta due to side effects and was taking hydrocodone, baclofen, and Motrin daily. Dieker reported that she recently became foster mother to a 7-month-old infant. R. 381. Dr. Real prescribed the NSAID diclofenac and increased the dosage of baclofen. R. 381-83.

On June 20, 2016, Dieker saw Dr. Real for a physical required for becoming a foster parent. Dr. Real stated that Dieker's cervical and lumbar disc disease was controlled with medication, and her depression was well-controlled. R. 391.

On September 1, 2016, Dieker saw Dr. Real and reported increased low back pain. Dieker had received a seven-month-old foster child in May 2016, which could have contributed to her pain. The pain was worse the month before the exam. Her left leg had some fatigue with walking or prolonged standing and the pain in the left leg was intermittent. She said she was trying to use the treadmill. R. 395. On examination, Dieker had full range of motion in her extremities with no pitting edema; she could both heel walk and toe walk; she could raise from a seated position to standing without difficulty; she could get on and off the examination table without difficulty; and her sensation and motor strength were intact throughout her

lower extremities.   R. 398.  Dr. Real ordered x-rays of Dieker's lumbar spine.  She declined a prescription for a course of prednisone.  R. 400.

On October 3, 2016, Dieker saw orthopedic surgeon Dr. Dennis Abernathie, M.D., for low back pain.  She rated the pain at 5/10 and said the pain was constant and getting worse.  Her symptoms were worse with kneeling, sitting, bending, climbing stairs, twisting, moving, standing, walking, lying in bed, and lifting.  She reported numbness, tingling, weakness, and her legs giving way especially the left. Sitting down and lying down helped the pain and Dieker said she could sit for five to 10 minutes, and she could walk a fourth of a mile.  Standing caused the most pain and lying down was the best position.  R. 419.

On examination, Dieker had negative straight leg raising testing.[2] She had good strength in her feet, normal motion in her hips, knees, and ankles, and tenderness at L3-4 facet joints.  Examination of her extremities was normal.  Dr. Abernathie diagnosed spondylolysis of the lumbar region, prescribed a back brace, and ordered physical therapy.  R. 420-21.

On November 14, 2016, Dieker saw Dr. Abernathie.  She rated her pain at 3/10 and reported that physical therapy improved her leg pain, but

---

[2] Straight leg raising is a test for lumbosacral nerve root irritation.  Straight Leg Raise Test - StatPearls - NCBI Bookshelf (nih.gov), visited February 1, 2022.

not her lower back pain.  R. 422.  On examination, Dieker was tender near the L5-S1 facet joint, she had painful range of motion and intact sensation in her feet, and her extremities were normal.  Dr. Abernathie assessed lumbosacral spondylosis, but no myelopathy.  Dr. Abernathie prescribed a Medrol Dosepak and continued physical therapy and ordered an MRI.  R. 423.

On November 28, 2016, Dieker saw Dr. Abernathie and reported that the Medrol Dosepak did not have any effect.  R. 425.  On examination, Dieker's back pain increased with extension of her back.  The flexibility of her lower extremities was reduced with extension and her upper extremities were normal.  Dr. Abernathie said that the MRI showed new disc degeneration at L3-4 with a failure of the facet joins and developing stenosis.  Dr. Abernathie diagnosed lumbar spondylolisthesis with spinal stenosis and ordered epidural steroid injections at L3-4.  Dr. Abernathie said surgery would be an option if the injections and physical therapy did not improve her condition.  R. 426-27.

On December 12, 2016, Dieker saw Dr. Abernathie and reported no relief from the epidural steroid injections.  R. 428.  On examination, Dieker was tender at L3-4 level.  Extension of her lumbar spine caused pain at that level that ran down her legs when she walked.  Straight leg raising tests

were positive.  She had slight weakness in her quad muscles in both legs and physical therapy exercises were not helping.  Her upper extremities were normal.  R. 429.  Dr. Abernathie recommended surgery.  R. 430.

On December 17, 2016, Dieker saw Dr. Abernathie.  Dr. Abernathie said a lumbar MRI showed moderate to high-grade stenosis of L3-L4 and L4-L5, some mild inflammation of L5-S1, subluxation with spondylolisthesis at L3-L4 and L4-L5.  Dr. Abernathie recommended proceeding with surgery.  R. 431-33.

On December 29, 2016, Dr. Abernathie performed back surgery on Dieker, a posterior fusion of L3 through S1 with interbody fusion at L3-L4.  During hospitalization after the surgery, a CT scan showed that a screw might be too close to a nerve, causing Dieker pain.  On January 3, 2017, Dieker underwent a second surgery to remove the screw.  After the second surgery, her leg pain was under control and she reported no numbness or tingling.  She could walk 200 feet with minimal right leg pain and had good strength and negative straight leg raising testing.  Her neurological examination was normal.  She was discharged on January 4, 2017.  R. 343-44.

On January 10, 2017, Dieker saw Dr. Abernathie.  She reported some weakness and numbness in her right leg and exerted a lot of effort to

lift her right leg.  On examination, straight leg raising was "fairly negative" bilaterally.  She had tender points over her sacroiliac (SI) joint.  Dr. Abernathie removed her stitches and told her she could start sitting and standing.  He prescribed physical therapy.  R. 435.

On January 31, 2017, Dieker saw Dr. Abernathie.  She reported pain in her right lower back and shooting pain in her groin and lower back when she took a deep breath or laughed.  She also had shooting pain in her groin down to her right leg when she turned her head or looked down.  On examination, she had pain in her lower back and hip; she had atrophy on the right thigh compared to the left; she had weakness of hip flexion on the right; straight leg raising was negative; she was tender in the lower right quadrant.  A CT scan of the lumbar spine looked normal to Dr. Abernathie.  A pelvic MRI showed edema in the right SI joint.  Dr. Abernathie ordered an EMG study and an MRI of the pelvis, and also ordered an injection into the right SI joint.  R. 437.

On February 22, 2017, Dieker saw Dr. Abernathie.  Her pain was 40 percent better, but she still reported intermittent right leg pain.  On examination, straight leg raising testing was negative.  Her mobility of her back above the fusion was good.  The EMG study showed acute and chronic denervation of the right-sided muscles between L2 and L4, which

suggested a nerve injury, but it was getting better.  Dr. Abernathie
recommended a nerve block injection at L2-3.  R. 439.

On March 14, 2017, Dieker saw Dr. Abernathie.  She reported
continued right leg pain above the knee, intermittent shooting pain in her
left leg, and giveaway weakness in her right leg.  She reported any
movement, including cervical movement, caused pain into the right hip.  On
examination, her shoulders and pelvis were aligned; she did not have any
back or SI joint tenderness; range of motion of her hips did not cause pain;
and she had good strength in her feet and good sensation.  Shortly after
muscle activation during the examination, Dieker had stabbing pain in the
groin.  Dr. Abernathie reviewed an MRI of her back and noted that her back
looked "pretty good."  The neural foramen were open and no screws were
in a place to bother her.  Dr. Abernathie prescribed Ultracet (tramadol-
acetaminophen) to take in addition to hydrocodone and muscle relaxants.
R. 441-42.

On March 27, 2017, Dieker's husband Edward Dieker (Edward)
completed a Function Report-Adult-Third Party form (Third Party Function
Report).  R. 217-24.  Edward and Dieker had been married 15 years and
lived together in a house.  Edward said that Dieker could not sit, stand, or
lie down for very long without pain.  During the day, Dieker got her children

ready for school, and did some housework. She took frequent breaks while doing housework and rested if she was able. Dieker's mother helped Dieker take care of the children. Edward said that Dieker had difficulty dressing herself and took showers because she could not take a bath. She had a difficult time shaving her legs. She could not sit very long to eat and she had difficulty wiping herself after using the toilet. R. 218. Dieker prepared quick meals and Edward learned how to cook because cooking was too hard for her. Dieker did very little housework because she could not stand for long, and she could not lift. She did no yardwork for the same reasons. R. 219-20. Dieker went out alone and drove and shopped once a week for food and household items. She could pay bills, handle a savings account, count change, and use a checkbook. R. 220. She spent time with family and friends and went to church and her children's school events on a regular basis. R. 221.

Edward said that Dieker's impairments limited her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and use her hands. She could lift less than 15 pounds and walk for 10 minutes before resting. She had to read written instructions multiple times to follow them. Spoken instructions might need to be repeated for her to follow them. She got

along well with authority figures.  She did not handle stress or changes in routine well.  She used a walker and a back brace.  R. 223.

On May 22, 2017, Dieker saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination.  Dieker reported pain after her December 2016 and January 2017 back surgeries.  She said she had nerve damage, constant pain in her neck and back, and headaches.  She could not do housework, and had difficulty preparing meals and washing dishes.  She had to lie down to get relief from the pain.  She also reported weakness in her right leg.  R. 483.  On examination, she was in no acute distress; speech was clear and understandable; had mild difficulty getting on and off the examination table; moderate difficulty tandem walking and severe difficulty walking on her toes and on her heels; was unable to squat and arise; could bear weight and ambulate without assistive devices.  She was oriented without delusions or hallucinations, could answer questions appropriately, and was in good contact with reality.  She had no edema in her lower extremities and no motor weakness or muscle atrophy.  Her motor strength was 5/5; she could appreciate pinprick sensation in all extremities; her reflexes were symmetric; her sensory exam was normal; and she had no joint redness or heat.  Her grip strength was 5/5 bilaterally, and she could perform both gross and fine manipulations with both hands.

She had limited range of motion in her lumbosacral spine, and she had paravertebral muscle spasms. Straight leg raising testing was negative bilaterally.  She had full range of motion in her joints and showed no evidence of cervical radiculopathy.  Dr. Chapa's diagnostic impression was chronic lumbosacral pain syndrome and chronic cervical pain syndrome. R. 484-85, 488.

On June 5, 2017, Dieker saw licensed clinical professional counselor Melissa A. Hildebrand, LCPC, for a behavioral diagnostic assessment. Dieker reported feeling depressed because of her pain and resulting inability to function.  The pain drained her energy so that she could not care for her children.  She became tired easily and had to lie down frequently during the day.  She could not maintain her home as she would like because of the pain and lack of energy and wanted to learn how to cope with the pain.  Dieker had trouble sleeping due to the pain.  Her appetite was diminished due to pain and side effects of her medication Wellbutrin. Her mother and mother-in-law helped out with the children and she did not socialize due to the pain.  Dieker denied any suicidal or homicidal ideations.  Dieker was oriented and alert; her mood and affect were flat and depressed; she was tearful and appeared fatigued and she had difficulty sitting up due to back pain.  Hildebrand assessed depressive disorder due

to another medical condition and recommended individual and family therapy.  R. 511-12.

On June 19, 2017, Dieker saw counselor Hildebrand.  Dieker felt better emotionally because she managed her pain better.  She believed she had attention issues.  Hildebrand recommended an assessment for services for her children to address attention issues and reduce stress.  R. 514.

On June 23, 2017, state agency psychologist Fred Stelling, MA LCP, conducted a psychological consultation and mental status examination. Dieker was appropriately dressed, spoke clearly, and could make eye contact; her statements were relevant; her mood was dysphoric, and her affect was restricted; she was oriented.  On examination, Stelling found "a concern" in concentration.  She did not evidence features of psychosis. She presented depressive and anxiety features related to her physical pain. Stelling assessed an adjustment disorder with mixed anxiety and depressed mood.  R. 490-92.  Stelling stated that Dieker's "concern in concentration … could indicate a moderate to marked decrease in ability to complete tasks that require a concerted focus."  He stated that Dieker's lack of energy "could project an unmotivated person who would have marked difficulty sustaining a productive pace."  He also stated that

Dieker's "diminished self-concept … could reflect a marked reduction of confidence in abilities."  Stelling stated that Dieker's mental prognosis was guarded as long as her physical pain continued.  R. 493.

On July 13, 2017, Dieker saw Dr. Abernathie for low back pain. Dieker rated her pain at 7/10 and reported no change in her pain with ice, rest, or physical therapy.  R. 496.  On examination, Dieker looked good. Dr. Abernathie could move her hips, knees, and ankles without a problem and she had good strength in her feet.  She experienced pain over her SI joint upon "standing or doing very much."  The pain radiated down her right leg.  Dieker's right upper extremity was normal.  Dr. Abernathie reviewed an EMG/nerve conduction study, which was normal.  Trendelenburg test was negative.  Dr. Abernathie recommended exercises to strengthen the SI joint and nerve glide exercises.  Dr. Abernathie prescribed amitriptyline to help Dieker sleep.  R. 497-99.

On July 17, 2017, Dieker saw counselor Hildebrand and reported being in significant pain.  She felt depressed because she could not complete household chores due to pain and she was tearful and reported feeling worthless.  Hildebrand counseled Dieker on improving her self-esteem.  R. 515.

On July 19, 2017, state agency psychologist Dr. Joseph Mehr, Ph.D., completed a psychiatric review technique.  Dr. Mehr opined that Dieker's depressive disorder was non-severe.  R. 77-78.

On July 26, 2017, state agency physician Dr. Bharati Jhaveri, M.D., prepared a Physical Residual Functional Capacity Assessment for Dieker. Dr. Jhaveri opined that Dieker could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally crawl; and frequently climb ramps, stairs, ladders, ropes, and scaffolds.  Dr. Jhaveri found no other limitations of her functional capacity.  R. 80-81.

On August 10, 2017, Dieker saw Dr. Real.  Dieker reported right leg weakness and shooting pain since the December 2016 surgery.  She had problems sitting and reported that the pain was less when standing and lying down.  Dieker reported that her depression was stable and she had good and bad days, depending on her pain.  Counseling sessions helped. She denied suicidal or homicidal ideations.  R. 522-24.

On August 30, 2017, Dieker saw counselor Hildebrand.  Dieker reported that her ability to manage her depression and anxiety depended on her pain level.  She reported feeling "foggy" due to pain and pain medication.  R. 559.

On September 12, 2017, Dieker completed a Function Report-Adult form (Function Report).  R. 249-56.  Dieker said she lived with her family. She could not work because she had pain with movement and had difficulty performing her personal care and dressing due to pain.  Her right hand was weak.  Her medications affected her cognitive function and caused problems remembering appointments.  Daily tasks were difficult to accomplish.  R. 249.  Usually, Dieker got her children ready and off to school; she then did a little housework but could not do much because of the pain; she occasionally cooked a simple meal for dinner and spent most evenings lying down on the couch.  She only did one or two tasks a day around the house and it took twice as long as usual to perform a task because of the pain.  She said that her husband, mother, and mother-in-law helped her take care of the children and do the housework.  Her father-in-law helped with the yard work.  The pain also interfered with her sleep. R. 250-51.

Dieker said she left the house daily and drove or rode in a car.  She went out alone and shopped for groceries once a week for 30 minutes at a time.  She had difficulty paying bills and often was late paying bills.  She did not keep her checkbook up to date due to pain and her medications.  R. 252.  Dieker said she rarely saw friends and family.  She went to her

children's games and went to church once a month.  She withdrew from her friends and also could be very irritated and anxious with her family.  She opined that her impairments limited her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, use her hands, and get along with others.  She did not finish what she started and often made mistakes when she attempted to follow written instructions.  She could follow spoken instructions for simple tasks, but had trouble following complicated spoken instructions.  She got along with authority figures, but could not handle stress or changes in routines.  She became upset very easily and felt overwhelmed and frustrated.  She wore a back brace daily.  R. 254-55.

On October 11, 2017, state agency psychologist Dr. Ellen Rozenfeld, Psy.D., prepared a Psychiatric Review Technique for Dieker.  Dr. Rozenfeld agreed with Dr. Mehr that Dieker's depressive disorder was non-severe.  R. 92-93.

On October 17, 2017, state agency physician Dr. Vidya Madala, M.D., prepared a Physical Residual Functional Capacity Assessment.  Dr. Madala opined that Dieker could occasionally lift 20 pounds and frequently 10 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally stoop, kneel, crouch, and

crawl; frequently climb ramps and stairs; never climb ladders, ropes, and scaffolds.  Dr. Madala further said that Dieker should avoid concentrated exposure to hazards.  Dr. Madala found no other limitations of her functional capacity.  R. 95-98.

On November 14, 2017, Dieker saw Dr. Real.  Dieker reported she saw a Dr. Teal, M.D., who recommended a spinal column stimulator.  She wanted to get a second of opinion from Dr. Mark Gold, M.D.  Dieker reported that her depression was stable and pain affected her mood.  R. 570.  Dr. Real made a referral to Dr. Gold for a second opinion.  R. 575.

On November 15, 2017, Dr. Real scheduled MRIs of Dieker's cervical and thoracic spine.  R. 582.  The cervical MRI showed anterior disc fusion C5-6 from an earlier surgery, minimal disc osteophyte at C6-7, and no significant central or foraminal stenosis.  The thoracic MRI showed mild multilevel degenerative changes with no significant central or foraminal stenosis.  R. 600.

On January 15, 2018, Dieker saw pain specialist Dr. Howard Dedes, M.D., for right leg pain, numbness, and weakness.  Dieker said she had these symptoms in her right leg after her December 2016 surgery.  Her right leg was weak and gave out and she sometimes dragged her right foot when she was tired.  She rated her pain at 6/10 and said the pain was

10/10 at the worst and was continuous.  The pain was somewhat better since it began and interfered with her "function and quality of life in the following manner: General Activity 100%, Mood 100%, Walking Ability 90%, Normal Work 100%. Relation With Other People 50%, Sleep 90% and Enjoyment of Life 100%."  She said that standing, sitting, walking, movement, bending forward, coughing, sneezing, and using the bathroom made the pain worse; and lying down made the pain better.  She reported anxiety, depression, and sleeping difficulties due to the pain.  On examination, she had normal range of motion in her extremities and paresthesias into the right lower extremities to light touch; her gait was slightly antalgic but functional without assistive devices; her strength was normal in the left lower extremity and 4/5 in the right; she had mild atrophy on the left leg consistent with disuse atrophy; her back had normal range of motion; she had mild tenderness to palpation in the lumbar paraspinals, and mildly positive straight leg raising testing on the right.  Dr. Dedes added Topamax for neuropathic pain and recommended continuing the exercises learned in physical therapy.  R. 599-601.

On January 17, 2018, Dieker saw neurosurgeon Dr. Mark Gold, M.D., for evaluation of her chronic back and right leg pain.  Dieker said she developed "intractable right leg pain" after the December 2016 surgery.

She had shooting pains from her lower lumbosacral area down her leg with movement.  The pain radiated into her groin and down to her right foot and increased with pressure such as sneezing, laughing, or straining at bowel movement.   She also stated that she had a burning, aching pain in her neck, muscle spasms, and frequent headaches when she looked down for prolonged lengths of time.  R. 608-09.  On examination, Dieker appeared distressed and tearful; she had normal motor strength in her lower extremities; she had intact sensation in both lower extremities to light touch.  Patrick's maneuver was mildly uncomfortable in both legs.[3]  Straight leg raising testing was somewhat uncomfortable in both legs.  Dr. Gold reviewed imaging that showed intact instrumentation and solid fusion from prior surgeries.  Dr. Gold's impression was that Dieker had chronic pain syndrome and depression and conventional back surgery would not treat her symptoms.  He recommended a spinal cord stimulator, but she said her insurance would not cover that.  R. 609-10.

On February 20, 2018, Dieker saw Dr. Real and reported some weakness and pain in both arms.  She had continuing pain in her back and right leg.  The right leg pain started after the December 2016 surgery and

---

[3] The FABERE/Patrick test is a maneuver of the hips and legs while supine to determine the presence or absence of sacroiliac disease.  Stedman's Medical Dictionary, 907150 "Patrick test," available on Westlaw Edge database, viewed February 2, 2022.

she reported more weakness, pain, and tingling in her hands and fourth and fifth digits.  The symptoms in her hands were worse with her arms raised in bed, brushing her hair, and giving baths to her children.  On examination, Dieker had decreased sensation in her fourth and fifth digits bilaterally and in the hypothenar region.  R. 623-24.

On February 26, 2018, Dieker saw Dr. Gold.  On examination, Dieker's gait showed no evidence of imbalance.  Dr. Gold reviewed a February 7, 2018 MRI and CT scan of Dieker's lumbar spine.  The studies showed instrumentation and surgical changes from L3-S-1; all screws appeared to be in reasonable location; the interbody devices at L4-L5 and L5-S1 appeared intact and in satisfactory position; there was no evidence of neuroforaminal or central stenosis at any level; the interbody arthrodesis appeared to be solid at L4-L5 level.  Dr. Gold concluded that Dieker had post lumbar laminectomy chronic pain syndrome with chronic radicular type pain in her right leg and again recommended a spinal stimulator once her insurance approved it.  He said there was no neurosurgical option to help her.  R. 636-37.

On April 8, 2018, an EMG study showed right mild carpal tunnel syndrome with no suggestion of chronic right C7 C8 radiculopathy, and no evidence of entrapment neuropathy in the left upper extremity.  R. 646.

On April 16, 2018, Dieker saw nurse practitioner Jordan Hogan, NP, in Dr. Dedes' office.  Dieker rated her pain at 4/10 and said the pain was in her low back and radiated into her right groin and down her right leg into her ankle.  She said her right leg was weak and gave out sometimes and she dragged her right foot when she was tired.  She said Topamax did not improve her pain and she also took hydrocodone and tramadol.  R. 651. On examination, Dieker had normal range of motion in all extremities; she was anxious and tearful; she had paresthesias to light touch in the right lower extremity; her back had a normal range of motion; her lumbar paraspinal muscles were tender to palpation.  Straight leg raising testing was mildly positive on the right.  Hogan reviewed the EMG study and the November 2017 and August 2017 MRIs.  Hogan increased the dosage of Topamax and recommended using a single point cane when walking and continuing her home exercise program.  R. 651-53.

On June 18, 2018, Dieker saw nurse practitioner Hogan.  Dieker rated her pain at 4/10 and said she noticed mild improvement of her pain with the increased dosage of Topamax.  She reported that her right leg was still weak and denied having any side effects from her medication.  On examination, her extremities had normal range of motion; she was oriented, alert, anxious, and tearful; she had paresthesias to light touch in her right

lower extremity; her gait was antalgic but functional; she had mild atrophy on the left lower extremity due to disuse; her back range of motion was normal; she had mild tenderness to palpation of the lumbar paraspinal muscles.  Straight leg raising testing was mildly positive on the right. Hogan added a low dose of gabapentin to the Topamax, hydrocodone, and tramadol and recommended a single point cane at all times for stability and continuing home exercise program.  R. 667-69.

On August 13, 2018, Dieker saw Dr. Dedes.  Dieker rated her pain at 4/10 and said that her medications made her "the most functional I have been in a long time."  She said she walked with a limp due to pain that caused spasms or shooting pain down her right leg.  On examination, she had normal range of motion of her extremities; she was oriented, alert, with an anxious affect and down mood; she was tearful; she had paresthesias with light touch in the right lower extremity; her gait was slightly antalgic but functional; she had normal strength in the left lower extremity and 4/5 strength in the right; she had mild atrophy in the left extremity consistent with disuse; her back range of motion was normal; she had mild tenderness to palpation of the lumbar paraspinal muscles.  Straight leg raising testing was mildly positive on the right.  Dr. Dedes recommended that Dieker try to taper down her use of either tramadol or hydrocodone.  R. 674-76.

On August 21, 2018, Dieker saw nurse practitioner Angelia D. Maxeiner, NP, in the office of Dr. Michael J. Eling, M.D., to establish primary care.  Dieker reported chronic pain in her neck, back, and hip and said she walked with a limp.  R. 682.  On examination, she had a normal mood and affect.  Her judgment, thought content, and behavior were normal.  She felt defeated due to the pain and she tried to stay "upbeat' by performing tasks in short periods and taking rest periods.  Dieker was interested in getting medical marijuana.  Maxeiner said she could not authorize medical marijuana as a nurse practitioner.  R. 682-83.

On September 4, 2018, Dieker saw Dr. Nathan Seaman, D.O., to establish primary care.  Dieker said she walked with a limp.  On examination, Dieker was in no acute distress; she had a pleasant mood and full affect and ambulated without assistance.  Dr. Seaman said he would complete the paperwork for medical marijuana at the next visit.  R. 688-89.

On October 11, 2018, Dieker saw nurse practitioner Hogan.  Dieker rated her pain at 4/10 and reported low back pain that radiated into her right leg.  Her pain was worse with activity and better with medication, but cold weather made the pain worse.  She reported neck pain that radiated into her right arm and said she was dropping things frequently.  She also

reported headaches.  She tried taking only tramadol and not hydrocodone, but she noticed a drastic increase in pain and irritability.  She tried taking only hydrocodone and noticed the same problems.  She went back to taking both.  R. 694.

On examination, Dieker had normal range of motion in her extremities; she had an anxious affect and down mood; she was tearful; she had paresthesias to light touch in the lower right extremity; her gait was slightly antalgic but functional; she had normal strength in the left lower extremity and 4/5 strength in the right; she had mild atrophy in the left lower extremity due to disuse; she had normal range of motion in her back; she had mild tenderness to palpation in her lumbar paraspinals and mildly positive straight leg raising testing on the right; she had normal strength in her upper extremities.  The range of motion of her right shoulder was limited due to pain and she had tenderness in the cervical and thoracic paraspinals.  Spurling's test was positive with pain into the right shoulder and upper arm.[4]  Facet loading was positive, greater right than left.[5]  She had myofascial pain in the right and left Splenius Capitus, Trapezius, and

---

[4] Spurling's test is a test for radiculopathy.  See Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's), at 1900.
[5] Facet loading maneuvers involve extending and rotating the spine to elicit a pain response.  Alexander, Sandean, and Varacallo, "Lumbosacral Facet Syndrome," Lumbosacral Facet Syndrome - StatPearls - NCBI Bookshelf (nih.gov), viewed February 2, 2022.

Levator Scapula with restriction of full range of motion at the muscle

attachment from guarding.  Hogan continued her medications and again

recommended that Dieker taper down her use of either tramadol or

hydrocodone.  R. 695-96.

On December 6, 2018, Dieker saw nurse practitioner Hogan.  Dieker

rated her pain at 5/10 and said the pain was in her right low back and

radiated down into her right leg to the calf.  The pain was continuous and

worse with activity.  Her medications made her pain better, but cold

weather made the pain worse.  She also had neck pain that radiated into

both arms and reported dropping objects frequently and having bilateral

numbness and tingling.  She reported also having headaches.  R. 747.

She tried taking just tramadol instead of both tramadol and hydrocodone

but felt a drastic increase in her pain.  She reported, she "went back to

taking both thereafter and has been able to function and be a 'good mother

to my kids.'"  R. 747.  On examination, Dieker was anxious without suicidal

ideations; she had "adequate and functional" range of motion in her

extremities; she had paresthesias in the right lower extremity to light touch;

her gait was slightly antalgic but functional without assistive devices; she

had 4/5 strength in her right lower extremity; she had mild atrophy in the left

extremity consistent with disuse; she had normal range of motion in her

back; she had mild tenderness to palpation of the lumbar paraspinals. Straight leg raising tests were mildly positive on the right and negative on the left.  She had symmetrical and intact strength in her upper extremities. Her range of motion in her right shoulder was limited due to pain and she had tenderness in her cervical and thoracic paraspinals.  Spurling's test was positive with pain into the right shoulder and arm.  Facet loading maneuvers on her cervical and thoracic spine were positive with the right greater than the left.  She had myofascial pain in her splenius Capitus, Trapezius, and Levator Scapula muscles during examination with tenderness to palpation and active trigger points within a palpable taut band.  Snapping palpation produced a referred pain pattern.  The myofascial pain restricted the full range of motion of these muscles' attachments.  Hogan recommended a spinal cord stimulator but noted that her insurance would not cover it.  Hogan recommended using a single-point cane at all times to prevent falling and to continue her home exercise program.  She also encouraged Dieker to taper down her use of tramadol and hydrocodone. R. 748-49.  Hogan adjusted her medications.  R. 749-50.

On January 7, 2019, Dieker saw Dr. Seaman.  Dieker reported to Dr. Seaman that she was, "Very limited with work, cannot lift more than 10 lbs. Pain all the time.  Needs to lay down frequently, needs to walk around

frequently.  Chronic pain from previous back and neck surgeries.

Decreased coordination in hands.  Started back in 2016."  On examination,

Dieker was in no acute distress; she ambulated without an assistive device;

her affect was full, and her mood was pleasant.  She had pain on range of

motion in her neck.  R. 771.

On January 7, 2019, Dr. Seaman also completed a Medical Source

Statement of Ability to Do Work-Related Activities (Physical) form (Medical

Source Statement).  R. 723-26.  Dr. Seaman opined that Dieker could

occasionally and frequently lift less than 10 pounds, stand and walk less

than two hours in an eight-hour workday, and sit for less than two hours in

an eight-hour workday.  Dr. Seaman stated that during an eight-hour

workday, Dieker would need to change positions every 15 minutes if sitting

and change positions every five minutes if standing; walk around 16 times

for 10 minutes each time; change positions at will; and lie down 16 times.

Dr. Seaman did not list any medical findings to support these opinions.  R.

723.

Dr. Seaman opined that Dieker could never twist, stoop (bend), or

crouch; and could occasionally climb stairs and ladders.  Dr. Seaman listed

as medical findings to support these opinions, "Patient has previous

lumbar/cervical spine surgery with hardware placement.  Subsequent

chronic pain and decrease range of motion."  R. 724.  Dr. Seaman opined

that Dieker could occasionally reach, handle, finger, feel, push or pull with

her upper extremities; and could never push or pull with her lower

extremities.  Dr. Seaman listed as medical findings to support these

opinions, "Decreased strength in legs.  Loss of fine motor coordination in

hands."  R. 724.  Dr. Seaman said that Dieker would need to avoid all

exposure to extreme cold and avoid moderate exposure to extreme heat;

high humidity; fumes, odors, dusts, and gases; perfumes; soldering fluxes;

solvents/cleaners, and chemicals and further stated, "No mental

impairment.  Pain in legs, back, neck chronic—frequent laying down,

walking to relieve pain."  Dr. Seaman listed as medical findings to support

these opinions, "Decrease ROM [range of motion] in spine, neck, lower

extremities pain with light touch, pain with movement."  R. 725.

Dr. Seaman opined that Dieker would be absent from work due to her

impairments more than four days per month and would be off task at work

25 percent or more of the workday.  Dr. Seaman said that she would need

an unscheduled break every 30 minutes during an eight-hour workday, with

each break lasting 10 minutes.  She would need the breaks due to muscle

weakness, chronic fatigue, pain/paresthesias, and numbness.  Dr. Seaman

agreed that Dieker's disability began on the Onset Date June 22, 2016.  R. 726.

## The Administrative Hearing

On February 7, 2019, an Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 34-72.  Dieker appeared in person and with counsel.  Vocational expert Bob Hammond also appeared.  R. 35.

Dieker testified first.  She lived in a house with her husband and four sons, ages 13, 11, 9, and 3.  R. 38.  The three-year old, Bryson, was a foster child that came to live with them in May of 2016.  Bryson was seven months old in May 2016.  R. 46, 50.  Dieker's husband and her older sons did most of the household chores, including the cooking and her husband did the grocery shopping.  Dieker said the three-year old was very independent.  He climbed up chairs and prepared his own simple meals.  He also climbed up a chair and washed his hands by himself.  Her father-in-law also lived nearby and helped her during the day if needed.  R. 39-40.

Dieker said she could not work because she had pain after her four back surgeries and two neck surgeries and she was in constant pain.  She lay down six or more times a day due to the pain and would lay down from 10 minutes to three hours at a time.  The pain interfered with her ability to carry on a conversation.  R. 39, 52.  She said, "The pain just consumes

every aspect of my life." R. 40. She had pain in her neck that traveled into her shoulders and arms, worse on the right. She had numbness that started in her fingertips and traveled up her arms to her arm pits and she had the neck pain, arm pain, and numbness on a daily basis. The numbness lasted one to two hours during the day and caused her to drop things. R. 47-49. Her hands also swelled up three to four times a month and the swelling lasted for an hour or two. R. 58-59.

Dieker said she had back pain in her thoracic and lumbar spine all day every day. The medication reduced the pain from 7-8/10 to 5/10. The back pain radiated down through her buttocks and hips to her legs and was worse on her right side. She had pain in her right leg every day which usually went down to the knee but, three to four hours a day, the pain in her right leg would go down to her ankle and foot. She also had pain in her left leg down to her knee for three to four hours a day. Her left knee swelled and her feet sometimes swelled. She applied heat and cold to her back three to four times a month to help with the pain and used her TENS unit about four times a month. The TENS unit did not give much relief. R. 54-60.

Dieker said she spent the day sitting with her three-year-old Bryson. R. 49. When she would lay down during the day, Bryson would lie down

with her or would play on the couch or on the floor.  R. 52.  She also took a nap from 1:00 p.m. to 3:00 p.m. when Bryson took a nap.  R. 61.

Dieker said she had headaches two to four times a month and each headache lasted four to five days.  Half of the time, she experienced light sensitivity with the headaches and one fourth of the time, she experienced nausea with the headaches.  She said she had these headaches since her neck surgery in 2015.  R. 46-47.  She took Topamax prophylactically to limit her headaches.  R. 66-68.

She had a driver's license and could drive, but she could only drive for 30 minutes at a time because her legs would start to hurt.  She also had difficulty turning her head due to pain in her neck.  R. 39-40, 65-66.

Dieker last worked for the Illinois Department of Children and Family Services as a foster parent support specialist.  She stopped working because she could not keep up with what she was required to do. She could not stay focused and could not remember things she needed to remember for the job and the computer work caused headaches.  She also had difficulty getting dressed and ready to go to work.  In the last six months of her work, she estimated that she missed one to three days a week due to her pain.  R. 43-44, 51.

The ALJ asked Dieker why she took in the foster child if she was in so much pain.  Dieker said, "Okay.  At the time that – that we took him, I – wasn't as severe as I am at this time.  I have since had another surgery." R. 50.  The ALJ said there was "a disconnect" because she could not work due to her pain, yet she took responsibility to care for a seven-month-old child.  Dieker responded:

> It's a hard question to answer. When you do foster care, you do it because you want to help a child. You know, probably we him, it was not the smartest age to take. When we took him in, it was – he was possibly just for a few days for another family to take him and then when he came into our home, it was, you know, a child comes in, it's always hard to -- to them let them go.

R. 50.  Dieker's in-laws lived close by and helped her take care of Bryson. Her husband and older children also helped out.  R. 50-51.  When Bryson was an infant, Dieker's in-laws helped her every day caring for him.  R. 51-52.

Dieker also had depression and agreed that her depression would go away if her back and neck pain went away.  R. 61-62.  She had crying spells three to four times a month and each spell lasted for a day.  She had trouble sleeping and woke up one to three times a night.  R. 62.

The ALJ decided not to examine the vocational expert at the hearing. She decided to submit written interrogatories after the hearing.  R. 69-70.

Interrogatories to the Vocational Expert

On March 21, 2019, vocational expert Hammond answered

interrogatories propounded on him in this case.  The ALJ asked Hammond

to assume the following individual:

> Assume a hypothetical individual who was born on December
> 17, 1980, has at least a high school education and is able to
> communicate in English as defined in 20 CFR 404.1564 and
> 416.964, and has work experience as described in your
> response to question #6 [Dieker's past relevant work]. Assume
> further that this individual has the residual functional capacity
> (RFC) to perform sedentary work as defined in 20 CFR
> 404.1567(a) and 416.967(a) except:
>
> - Never climb ropes, ladders or scaffolds but
>   occasionally climb ramps and stairs
> - Occasionally stoop, kneel, crouch and crawl
> - Avoid all exposure to unprotected heights
> - Avoid moderate exposure to vibration and
>   concentrated exposure to extreme cold, extreme heat,
>   humidity and wetness
> - Limited to simple, routine repetitive tasks (consistent
>   with SVP 1 or 2)
> - Limited to low stress jobs, with "low stress" defined as
>   occasional decision making and occasional changes in
>   work-setting.

R. 331.  Hammond opined that such a person could not perform Dieker's

past relevant work.  Hammond opined that such a person could perform

other jobs that existed in the national economy, including an ampoule

sealer, with 90,000 such jobs in the national economy; circuit board

screener, with 105,000 such jobs in the national economy; and

polisher/assembler glasses, with 120,000 such jobs in the national

economy.  R. 332, 334.  Hammond further opined that a person could not

maintain employment if she missed work more than one day a month for

the first 90 days of working a job, or if she missed more than 10 days in a

12-month period.  Hammond opined that employers would not tolerate a

person being off task at work more than 10 percent of the time (in addition

to regularly scheduled breaks).  R. 335.

### THE DECISION OF THE ALJ

On August 23, 2019, the ALJ issued her decision.  The ALJ followed

the five-step analysis set forth in Social Security Administration Regulations

(Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the

claimant not be currently engaged in substantial gainful activity.  20 C.F.R.

§§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a

severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3

requires a determination of whether the claimant is so severely impaired

that she is disabled regardless of her age, education, and work experience.

20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3,

the claimant's condition must meet or be equal to the criteria of one of the

impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Dieker met her burden at Steps 1 and 2.  She had not worked since the Onset Date and she had the severe impairments of degenerative disc disease of the lumbar and cervical spine status post spinal surgeries, mild degenerative disc disease of the thoracic spine, and an affective disorder of depression.  R. 15.  At Step 3, the ALJ found that

Dieker's impairments or combination of impairments did not meet or equal

a Listing.  R. 16-17.

The ALJ then determined that Dieker had the following RFC:

5. After careful consideration of the entire record, the
undersigned finds that, through the date last insured, the
claimant had the residual functional capacity to perform
sedentary work as defined in 20 CFR 404.1567(a) except she
should never climb ropes, ladders or scaffolds but is able to
occasionally climb ramps and stairs. She is able to occasionally
stoop, kneel, crouch and crawl. The claimant should avoid all
exposure to unprotected heights, moderate exposure to
vibration, and concentrated exposure to extreme cold, extreme
heat, humidity and wetness. She is limited to routine, repetitive
tasks consistent with an SVP of 1 or 2. She is limited to low-
stress jobs, defined as occasional decision-making and
occasional changes in the work setting.

R. 18.  The ALJ recited the medical and psychological evidence in detail.

R. 21-24. The ALJ also reviewed the opinion evidence.  R. 24-26.  The ALJ

concluded:

In sum, the above residual functional capacity assessment is
supported by the imaging results, the physical examinations,
and the mental status examinations of the claimant. The
claimant's lumbar, cervical, and thoracic degenerative disc
disease was considered in limiting her to the sedentary
exertional level with additional postural and environmental
limitations. The medical evidence shows that, following her
December 2016 lumbar fusion surgery, the claimant continued
to experience some right lower extremity weakness, some left
lower extremity disuse atrophy, and some paresthesias in the
right lower extremity to light touch. However, imaging showed a
solid fusion, and an EMG in July 2017 was normal. The
claimant sometimes has an antalgic gait and walked with a
limp. Though she was recommended to use a cane, the

evidence does not show that she found a need to use a cane or any assistive device, and certainly not on a sustained or regular basis. She reported use of a walker after her surgery, but there is no evidence to support she used a walker outside of the immediate post-surgery recovery period.

Further, many treatment examinations indicated the claimant had good range of motion and looked athletically fit and well in examination. In fact, one treatment record noted bothersome reports of severe pain that were not reproduced with specific motion. The claimant's subjective complaints, particularly complaints of the need to lie down throughout the day, are inconsistent with her activities, including caring for a young child, preparing simple meals, attending her children's sporting events, shopping and driving.

The claimant's affective disorder was considered in limiting her to simple, routine, and repetitive tasks in a low-stress environment, for reasons previously noted, and in combination with the issue of pain and medication side effects. She had little mental health treatment. She had generally normal mental status examinations, but for an anxious affect and a down, tearful mood at times. She was referred for psychiatric evaluations, but treatment records do not show that she complied with that recommendation. The limited treatment records for behavioral health noted very few objective findings in mental status examinations. Her complaints and the effects of her medications were fully considered in determining the mental health limitations in the residual functional capacity.

R. 26-27.

In reaching this conclusion, the ALJ gave no weight to Dr. Seaman's opinions in the 2019 Medical Source Statement. The ALJ said there were no objective findings to support the limitations to which Dr. Seaman opined. R. 24-25. The ALJ also gave state agency psychologist Stelling's opinions

little weight.  The ALJ said that Stelling's objective findings in his examination did not support his opinions of marked limitations in mental functioning.  The ALJ also noted that Dieker sought little treatment for her mental impairment.  Additionally, the ALJ noted that Dieker continued to foster a child, "which requires greater ability than suggested by Mr. Stelling."  R. 25.

The ALJ gave some weight to the opinions of psychologists Drs. Mehr and Rozenfeld.  The ALJ, however, found that Dieker had more than mild limitations in the areas of concentrating, persisting, and maintaining pace as well as adapting and managing herself.  R. 24.  The ALJ gave little weight to Dr. Jhaveri's opinions because Dieker had greater limitations than he said.  The ALJ gave weight to the postural limitations found by Dr. Madala, but she concluded that the medical record supported a finding of a limitation to sedentary work rather than light work as found by Dr. Madala. R. 24.

The ALJ then concluded at Step 4 that Dieker could not perform her past relevant work.  The ALJ relied on the RFC finding and the opinions of vocational expert Hammond.  R. 27.

At Step 5, the ALJ found that from the Onset Date to the Date Last Insured Dieker could perform a significant number of jobs that existed in

the national economy.  The ALJ relied on the Medical-Vocational

Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of

vocational expert Hammond that a person of Dieker's age, education, work

experience, and RFC could perform the representative jobs of ampoule

sealer, circuit board screener, and polisher/assembler, glasses.  The ALJ

concluded that Dieker was not disabled from the Onset Date through the

Date Last Insured.  R. 27-28.

Dieker administratively appealed the decision of the ALJ.  On July 9,

2020, the Appeals Council denied Dieker's request for review.  The ALJ's

decision then became the final decision of the Defendant Commissioner.

R. 1.  Dieker then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

3:20-cv-03223-TSH   # 21   Page 40 of 46

of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to her conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

    The ALJ's decision was supported by substantial evidence.  The ALJ carefully reviewed the medical evidence and found that Dieker could perform a very limited range of sedentary work.  The record contained medical evidence to support this conclusion.  Several examinations, including Dr. Chapa's, showed normal or functionally adequate range of motion in Dieker's upper extremities, normal grip strength, normal ability to perform fine and gross manipulations, and the ability to ambulate without an assistive device.  Imaging studies of Dieker's spine showed surgical changes that were in place and further showed no stenosis.  An EMG of

Page **40** of **46**

her lower extremities showed no radiculopathy.  The decision was also supported by Dr. Madala's opinion.  The ALJ further found that Dieker's statements about the limiting effects of her symptoms were not consistent with her reported activities of caring for a young child, preparing simple meals, and attending children's sporting events.  The ALJ reviewed and considered other evidence that tended to prove more severe limitations. The ALJ, however, found that when weighing all that evidence, Dieker could perform a narrow range of sedentary work.  When viewed as a whole, a reasonable person might find the evidence on which the ALJ relied as adequate to support her decision.  Richardson v. Perales, 402 U.S. at 401.  The RFC decision, therefore, was supported by substantial evidence.  The RFC decision and the opinions of vocational expert Hammond supported the decision at Step 5 that Dieker could perform a significant number of jobs in the national economy.

Dieker argues that the ALJ erred in her evaluation of Dr. Seaman's opinion.  The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record.  20 C.F.R. § 404.1527(d)(2);

Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008).[6]  The ALJ found that no

objective medical evidence supported the limitations that Dr. Seaman

found.  R. 24-25.  The Court agrees that medical evidence did not support

Dr. Seaman's opinions that during an eight-hour workday Dieker would

need to lie down 16 times and walk around 16 times, or his opinions that

she was limited in reaching, handling, fingering, and feeling.  The Court

also agrees that objective medical evidence did not support his opinion on

work absences, unscheduled breaks, and off task behavior.  The Court

finds no error in the ALJ's consideration of Dr. Seaman's opinions.

Dieker also argues that the ALJ erred in her evaluation of

psychologist Stelling's opinions that Dieker's mental limitation caused

moderate to marked limitations in her ability to complete tasks that required

concerted focus; a marked difficulty in sustaining productive pace, and a

marked reduction of confidence in her abilities.  The ALJ correctly noted

that the objective findings in his examination did not support these

opinions.  The ALJ also stated that the other medical evidence in the record

did not show hospitalizations for mental impairments or evaluations by a

---

[6] The Commissioner amended the regulations regarding the interpretations of medical evidence.  The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).  Dieker filed her claim before that date.  As such, the amendments do not apply here.

psychiatrist.  Additionally, the ALJ noted that Dieker was able to take care of a small child which indicated greater ability than opined by Stelling.  R. 25.  The Court finds that the ALJ adequately explained why she concluded that Stelling's opinions were not supported by objective medical evidence and were inconsistent with other evidence in the record.  There was no error in the consideration of the opinions of Dr. Seaman and psychologist Stelling.  Dieker's arguments to the contrary are not persuasive.

Dieker argues that the ALJ found that she was not disabled because she had a foster child in the household.  The Court disagrees.  The ALJ considered rearing a foster child from infancy as one of Dieker's activities during the relevant period from the Onset Date to the Date Last Insured. Dieker clearly was rearing Bryson as her foster child.  The ALJ did not find that rearing an infant was equivalent to being able to perform sedentary work.  Rather, the ALJ found that rearing an infant growing to be a toddler was one piece of evidence that was inconsistent with Dieker's statements about the limiting effect of her symptoms.  This was clearly appropriate. See SSR 16-3p, 2017 WL 5180304, at *7. (The claimant's daily activities are relevant for evaluating statements about the limiting effects of symptoms).    The ALJ also properly noted that rearing an infant was evidence in the record that was not consistent with psychologist Stelling's

opinion.  This was also clearly proper.  <u>See</u> 20 C.F.R. § 404.1527(d)(2) (The opinions must be consistent with the other evidence in the record to be given controlling weight).  The consideration of child rearing activities was relevant.  The Court sees no error in the ALJ's consideration of the evidence that Dieker was rearing a foster child.

Dieker argues that the ALJ's RFC determination was not supported by substantial evidence.  The Court again disagrees.  As the Court explained, the ALJ reviewed the evidence in detail and explained her evaluation of that evidence.  The Court will not reweigh the evidence.  Dieker argues that the ALJ is not competent to formulate an RFC.  The regulations authorized and directed the ALJ to make an RFC determination.  <u>See</u> 20 C.F.R. §§ 404.1520(e) and 404.1545.  The ALJ did not err by following those regulations.

Lastly, Dieker argues that the ALJ found Dieker was moderately limited in concentrating, persisting, or maintaining pace, but then erred by not including those limitations in the RFC.  Instead, the ALJ limited Dieker to simple, routine, repetitive tasks, and low stress jobs.  Dieker argues that this was error.  Dieker relies on <u>DeCamp v. Berryhill</u>, 916 F.3d 671, 675-76 (7th Cir. 2019).  In <u>DeCamp</u>, the ALJ, like here, found that the claimant was moderately limited in concentration, persistence, and pace.  The ALJ

attempted to account for that limitation in the RFC by limiting the claimant to unskilled work with no fast-paced production line or tandem tasks. <u>DeCamp</u>, 916 F.3d at 676.

The <u>DeCamp</u> decision in 2019, however, did not consider the 2016 amendment to the Listings for mental disorders.  <u>Revised Medical Criteria for Evaluation Mental Disorders</u>, 81 Fed. Reg. 66138, 66147 (Sept. 26, 2016).  The amendments defined the meaning of "moderate limitation" to be "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair."  Listing 12.00(F)(2).  Based on this definition, the Seventh Circuit in 2021 has found that a moderate limitation in concentration, persistence, or pace "seems consistent with the ability to perform simple, repetitive tasks at a consistent pace."  <u>Pavlicek v. Saul</u>, 994 F.3d 777, 783 (7th Cir. 2021); <u>accord</u> <u>Jozefyk v. Saul</u>, 923 F.3d 492, 498 (7th Cir. 2019) (citing with approval <u>Sims v. Barnhart</u>, 309 F.3d 424, 431 (7th Cir. 2002) for the proposition that "claimant with moderate limitations in concentration, persistence or pace can perform 'simple and repetitive light work'").  In light of the 2016 amendments to the mental impairment Listings and the more recent decisions in <u>Pavlicek</u> and <u>Jozefyk</u>, the Court finds that the ALJ had substantial evidence to support her decision to address Dieker's moderate limitations maintaining

3:20-cv-03223-TSH  # 21  Page 46 of 46

concentration, persistence, or pace in the RFC by limiting her to routine, repetitive tasks and to low-stress jobs, defined as occasional decision-making and occasional changes in the work setting.

THEREFORE, IT IS ORDERED that the Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 19) is ALLOWED, Plaintiff Laura Dieker's Brief in Support of Motion for Summary Judgment (d/e 16) is DENIED; and the Decision of the Defendant Commissioner is AFFIRMED.  THIS CASE IS CLOSED.

ENTER:   March 18, 2022

_____ s/ *Tom Schanzle-Haskins* _____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE